UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHRISTOPHER CRAFT,<br><br>Plaintiff,<br><br>v.<br><br>BRISON SWEARINGEN,<br>BRADEN CROWLEY,<br>STAN ROARK,<br>ODDERBEAN,<br>CHRISTI,<br>QUALITY CORRECTIONAL CARE,<br><br>Defendants. | ) | No. 2:24-cv-00123-JRO-MG |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND GRANTING MOTION TO STRIKE**

Plaintiff Christopher Craft's lawsuit is proceeding with Fourteenth Amendment claims against Defendants Sheriff Brison Swearingen[1] and Brandon Crowley[2] (collectively the "Clay County Defendants") for his conditions of confinement as a pretrial detainee at the Clay County Jail (the "Jail") as well as Fourteenth Amendment claims against Defendants Stan Roark, Otterbein,[3] Christi, and Quality Correctional Care (collectively the "Medical Defendants") for the medical treatment he received at the Jail. All Defendants have moved for summary judgment. Dkts. [45], [50]. The Clay County Defendants have also filed

[1] The claim against Defendant Swearingen is brought in his official capacity only.

[2] This defendant has clarified that his first name is "Brandon" and not "Braden," as Craft had spelled it. Dkt. 45 at 1.

[3] This defendant has clarified that her surname is "Otterbein," not "Odderbein," as Craft had spelled it. Dkt. 50 at 1.

a motion to strike. Dkt. [77]. For the reasons below, all three motions are **GRANTED**.

## I. MOTION TO STRIKE

The Clay County Defendants ask the Court to strike Craft's June 1, 2026, filing at docket entry 76. It is two pages long and asserts that the Clay County Defendants are responsible for Craft's injuries. The Clay County Defendants object that the filing is a surreply not allowed by local rule and argue that the Court should strike it.

Craft's deadline to respond to the motions for summary judgment was May 15, and he filed a response on May 4. The Clay County Defendants filed a reply on May 18. Southern District of Indiana Local Rule 56-1(d) provides:

> A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply must be filed within 7 days after the movant serves the reply and must be limited to the new evidence and objections.

Craft's filing was not filed within seven days of the reply and is about the underlying question of liability, not any new evidence or evidentiary objections. Therefore, the Court **GRANTS** the motion to strike. Dkt. [77]. The filing at docket entry 76 is **stricken**.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the

record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## III. FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Craft and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

## A. Parties

Craft was a pretrial detainee in the Jail in 2023. Dkt. 47-1 at 28–29; Dkt. 21. Brison Swearingen is the Sheriff of Clay County. Dkt. 1 at 1. Brandon Crowley is the Jail Commander of the Clay County Jail. Dkt. 47-18 at 1.

During the relevant time period, the Jail had a contract with Quality Correctional Control ("QCC") in which QCC agreed to provide the medical treatment for inmates of the Clay County Jail. Dkt. 47-18 at 1. There are no QCC policies, written or unwritten, that would place cost above patient care. Dkt. 51-2 at 8.

During the times relevant to this lawsuit, Aimee Otterbein was a licensed nurse practitioner (NP) employed by QCC and working at the Jail. Dkt. 51-2 at 1. During the times relevant to this lawsuit, Stan Roark was a registered nurse employed by QCC and working at the Jail. *Id.* During the times relevant to this lawsuit, Christie Leturgez was a licensed practical nurse (LPN) employed by QCC and working at the Jail. *Id.* at 2. LPN Leturgez was charged with "a variety of nursing tasks including completing patient evaluations, conveying patient information to [NP Otterbein], and carrying out medical orders issued by [NP Otterbein] or any other medical provider." Dkt. 51-2 at 2.

Craft named Sheriff Swearingen as a defendant in this case because "he's the head of Crowley. He's the head of the whole show. He's the head of all the deputies here, . . . the head of the whole building here, the nursing staff included." Dkt. 47-1 at 204. Craft named Crowley as a defendant with respect to

his medical care claim because Crowley is "the head of all of it . . . the leader." Dkt. 47-1 at 110.

**B. Craft's Initial Eye Issues at the Jail**

On July 29, 2023, paint chips fell from the Jail ceiling and into Craft's eyes as he was showering. Dkt. 1 at 2.[4] He removed some big paint chips himself. *Id.* LPN Leturgez looked at Craft's eye and said it looked like he had metal in his eye and that it was "not that big of a deal." *Id.* She told Craft to put in a sick call if it hurt more and did nothing further. *Id.*

On July 31, Craft was seen by Nurse Roark and the visit report notes "a head injury and metal shaving in his eye" and that he was "hit in the head about three months ago." Dkt. 47-2 at 2. The report also indicates, "Patient is aware of how to put in a sick call. Will let MD know of any medical issues that arise." *Id.*

Craft put in a sick call on August 3 because his vision was getting worse and his eye was dry, red, painful, and "didn't feel right." Dkt. 1 at 3. He was seen on August 4. Dkt. 47-5 at 1. Nurses Roark and LPN Leturgez looked at his eye, confirmed there was something that looked like metal in it, and told Craft "there wasn't much they can do" for him. Dkt. 1 at 3.

That same day, jail staff transported Craft to Union Hospital for an assessment of his eye. Dkt. 47-1 at 22; Dkt. 47-6. At the hospital, a non-party physician's assistant told Craft that he had something non-metallic in his eye that she would not remove because it was healed over. Dkt. 1 at 3. She said that it would have been easier to remove if he had come in closer to when it happened,

[4] Craft verified his complaint under penalty of perjury. *See* dkt. 1 at 7.

but since it had healed over he would need to have it removed by an eye doctor. *Id.* However, this physician's assistant appears to have assumed the metal was in Craft's eye for 2-3 months, instead of less than one week. The medical records from the Union Hospital visit note that "metal likely will need burr to remove considering in eye 2-3 months." Dkt. 47-6 at 1. Ultimately, the physician's assistant determined that Craft should have a close follow-up with an ophthalmologist and referred Craft to the UAP Eye Center in Terre Haute. Dkt. 47-6 at 1–2. Craft was discharged from the emergency department with a 7-day prescription for tobramycin eye drops. Dkt. 47-6 at 1. Upon Craft's return to the jail, his medications were ordered. Dkt. 51-2 at 3. On August 9, Craft had a follow-up visit with NP Otterbein. Dkt. 47-8 at 1.

On August 11, Craft was taken to an outside appointment with Dr. Bonham, an ophthalmologist at EyeCare Specialists in Brazil, Indiana, for a follow-up pursuant to the recommendation by Union Hospital. Dkt. 47-9; Dkt 51-2 at 4. Dr. Bonham noted that removing the foreign body would require numbing injections, which she does not do. Dkt. 47-9.

The same day, Craft was taken to an appointment at the UAP Eye Clinic, where Dr. Burns examined Craft. *Id.* Dr. Burns's treatment plan was to refer Craft for incision and removal under anesthesia. *Id.* Dr. Burns also recommended a pre-operative CT scan and prescribed antibiotic eye drops (tobramycin) to Craft. *Id.* As of August 14, the referral for an eye surgeon was pending, information was sent to Eskenazi Eye on August 25, and QCC

personnel followed up on August 28 and were informed that Eskenazi Eye would call within two weeks to make an appointment. Dkt. 51-1 at 83.

In an August 16 grievance, Craft asked why his eye drops had stopped, stated that his eye was irritated and dry, that he had matted eyelashes in the morning, and that he needed a CT scan and surgery to remove the objects from his eye. Dkt. 47-10 at 1. Medical staff responded the following day advising that his eye drops were prescribed for short term use, but that he had appointments scheduled and would be seen in sick call soon. *Id.*

Later that day, Nurse Roark saw Craft during sick call, and after Craft notified NP Otterbein and Roark that his eye still hurt, NP Otterbein determined that Craft should continue his eye drops for an additional five days. Dkt. 47-5 at 3–4. Craft was instructed to place a warm rag on his eye as needed throughout the day. *Id.* at 4. NP Otterbein noted that there was slight redness in Craft's left eye, but that there was no visible disruption. *Id.*

A CT scan was performed on Craft's face on August 22; the exam revealed there was no evidence of a radiopaque foreign body in Craft's eye. Dkt. 47-12 at 2.

On August 24, Craft submitted a grievance stating, "I've seen 3 Dr over eye and nothing been done. I've been put on meds twice and taken off again. my eye is getting worse I'm seeing 4 to 6 dots at all times and I feel like its [sic] taking me longer to focus on things my eye is blurry when getting up or when I open it. my eye lashes still sticking together when I get up looks to be clear but closer to corner seems darker. It feels like that eye is bigger I feel like got pressure on just

that one eye. it just feels off to me. can't see as good." Dkt. 47-11 at 1. Medical staff responded the next day, stating that he would be seen soon. *Id.* at 2.

He was seen during sick call that same day. Dkt. 47-5 at 4–5. Nurse Roark noted Craft's objective symptoms were "unremarkable" and that there was slight redness and no discharge. *Id.* at 5. Nurse Roark noted that if the symptoms persisted or worsened, Craft would be referred to the QCC doctor. *Id.* at 5. Craft's "Plan of Care" already included an appointment at Eskenazi and an appointment to have Craft's left eye X-rayed. *Id.* at 6.

Craft's left eye was X-rayed on August 25. Dkt. 47-13. No radiopaque foreign body was seen, but it was noted that "many objects cannot be detected on plain film." *Id.*

### C. Medical Isolation Cell

On August 27, LPN Leturgez saw Craft for complaints that his other eye was red, swollen and matted shut. Dkt. 51-1 at 83; dkt. 51-2 at 5. NP Otterbein prescribed tobramycin antibiotic eye drops and had Craft moved to a medical isolation cell closer to medical staff. *Id.*; dkt. 47-1 at 207.

On August 28, QCC nursing staff called Eskenazi Eye Center and was informed that the eye center would call to make an appointment within two weeks. Dkt. 51-1 at 83. The next day, Nurse Roark saw Craft and noted yellow/green discharge in the morning. *Id.* at 83–84. Nurse Roark notified NP Otterbein, who then prescribed Cipro eye drops. *Id.* at 84.

On August 30, Craft, Mr. Crowley, NP Otterbein, Nurse Roark, LPN Leturgez, and another correctional officer met to address Craft's multiple

grievances filed in the week prior and to resolve them. Dkt. 47-1 at 103; Dkt. 47-8 at 1–2. Craft had complained about having been "placed up front," that it is "boring where he's at," that his tablet was taken away, and that he counted twenty minutes from when he hit the "button" in his cell to when someone came to talk to him. Dkt. 47-8 at 2. Records from the meeting also show that Craft has been using the warm cloth compress on his eye two to three times a day, and denied any worsening of his vision or blindness. *Id.* NP Otterbein examined Craft's eye and noted the following: "HEENT: pupils 2, intact, reactive bilaterally. EOMI intact bilaterally. negative nystagmus. Negative scleral injection. Negative active drainage or crusted drainage to left eye. Negative edema." *Id.* Craft stated that the "metal piece may not be there, but now there may be a paint chip from the walls here," but did not recall when paint chips may have gotten into his eye. *Id.*

Craft was (1) advised that he had two outside eye appointments scheduled, (2) informed that he was in medical isolation to ensure that his eye did not get worse, to enable more frequent monitoring, and to prevent tampering with his eyedrops; and (3) educated about how to care for his eye. Dkt. 47-8 at 2. Crowley stated he would get Craft a new tablet that day. *Id.* Crowley also said the grievance was resolved and threatened to "write up" Craft if he filed any more grievances. Dkt. 1 at 5.

From August 27 to 30, Craft took two or three showers while in medical isolation. Dkt. 47-1 at 202.

**D. The "Padded Cell"**

Midday on August 30, Craft was moved from the medical isolation cell to the next cell over, which was called the "padded cell"—the only such cell in the Jail. Dkt. 47-1 at 72, 192–93. The move was not due to Craft's behavior; another inmate had a serious medical concern and needed the medical isolation cell. Dkt. 47-1 at 193.

Immediately prior to Craft entering the "padded cell," the floor of the cell was swept with a broom and mopped. Ex. R (video of "Padded Cell"); Dkt. 47-1 at 191–92. There was blood on the wall of the cell as it appeared another inmate had picked his nose and rubbed it on the wall, and there was food matted on the ground, although none of that can be clearly seen on security camera footage as they show up only as "little smudges." Dkt. 47-1 at 190. After complaining about the dirty cell for "a couple of days" to correctional officers, cleaning supplies were brought to Craft. *Id.* at 199. He does not remember which correctional officers he spoke to, but Crowley was their boss. *Id.* Craft did not tell Crowley that the cell was dirty. Dkt. 47-1 at 198–200. Craft has never been diagnosed with a staph infection. *Id.* at 196.

In the evening of September 1, Craft moved out of the "padded cell." Dkt. 47-1 at 200–02. Craft believes he took at least one shower while housed in that cell. *Id.* at 202.

**E. Outside Eye Appointments**

On September 6, Craft was seen at Union Medical Group for an eye appointment, and Dr. Burns recommended that the object be removed from Craft's eye. Dkt. 47-4.

Two days later, Craft was seen at Eskenazi Health ("Eskenazi"). Dkt. 47-1 at 168; Dkt. 47-19. After examining Craft's eye, the doctor at Eskenazi determined the recommended treatment plan was to monitor the eye, not remove the object, since the "[r]isk of removal outweighs benefits at this time as non-exposed and not causing inflammation." Dkt. 47-19 at 1. The provider also noted that Craft had foreign bodies in both eyes, which was the first time Craft learned that there were also objects in his right eye. *Id.*; dkt. 47-1 at 138.

The eye specialists had differing recommendations for treatment, and NP Otterbein chose to follow the recommendation from Eskenazi because that specialist is an eye surgeon. Dkt. 51-2 at 7. Crowley deferred to the expertise of QCC medical staff to determine the appropriate treatment for Craft's eye injury. Dkt. 47-18 at 2.

**F. Remaining Time at the Jail**

On September 11, Craft submitted a grievance complaining about his living conditions and stating that he had paint chips in his eyes that brought him pain every day. Dkt. 47-20. The next day, Craft was called in sick call, where records reflect that he reported seeing flashes in his right eye, that the flashes also appeared in the left eye, that he was seeing black dots in his vision, and that the foreign object was still present in the left eye. Dkt. 47-5 at 8.

Craft was released from the Jail on September 13. Dkt. 47-21. Slightly more than a month later, he was re-booked into the Jail on October 19. Dkt. 47-18 at 2.

On October 23, Craft was seen in sick call and reported to non-party Nurse Stephanie Vanatti that he had paint chips in his eye from the last time he was in the Jail. Dkt. 47-5 at 9. Nurse Vanatti noted that Craft reported no visual disturbances, and while he claimed he went to an eye specialist two weeks prior, he refused to sign a Release of Information to obtain the records from the eye specialist. *Id.* Nurse Vanatti referred Craft to the provider. *Id.* at 10.

Two days later, Craft was seen by NP Otterbein, who noted the foreign body present in Craft's left eye but no drainage, erythema, or edema. *Id.* at 12. Follow up was indicated if symptoms persist or worsen. *Id.*

Records were obtained from Eskenazi Ophthalmology that recommended monitoring the foreign body due to the risk of removal outweighing its benefit. Dkt. 51-1 at 48.

Craft was released from the Jail on November 4. Dkt. 47-18 at 2.

Craft acknowledges that the Jail scheduled and transported him to "about seven or eight" outside medical appointments and that he probably saw at least seven providers outside of the Jail in addition to seeing at least four QCC medical professionals inside the Jail. Dkt. 47-1 at 32, 184.

## IV. DISCUSSION

Craft brings claims under the Fourteenth Amendment against (1) QCC and Sheriff Swearingen (in his official capacity) under the theory described in *Monell*

*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), (2) Crowley for the conditions of Craft's confinement in the medical isolation and "padded" cells and for disregarding Craft's complaints about his medical care, and (3) Nurse Roark, LPN Leturgez, and NP Otterbein for delayed or inadequate medical treatment of his eye injury.

**A. *Monell* Claims**

To succeed on a *Monell* claim, the plaintiff must identify an action taken by the municipality and allege a causal link between the municipality's action and the deprivation of federal rights. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). "A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Cnty. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019). A sheriff acting in his official capacity can be sued under § 1983 when the Sheriff's Department's actions violate the Constitution. *See id.* (applying *Monell* to claim against Sheriff's Department)). Private corporations acting under color of state law, such as QCC, are also treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell*).

"Liability under this standard is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took deliberate action that was the moving force behind a constitutional injury." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th Cir.

2022) (cleaned up). Importantly, even though Craft was a pretrial detainee during the events in this lawsuit, "[m]unicipal liability only attaches when the plaintiff shows that the municipality acted with deliberate indifference." *Gasaway v. Vigo Cnty. Sheriff's Dep't*, 672 F. Supp. 3d 651, 660 (S.D. Ind. 2023) (citing *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020)); *see also Miranda v. County of Lake*, 900 F.3d 335, 353–54 (7th Cir. 2018) (applying deliberate indifference standard to pretrial detainee's *Monell* claim).

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.* There is no vicarious liability of a municipal party for the misdeeds of its employees. *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 826 (7th Cir. 2022).

Craft has not identified a policy, custom, or final decisionmaker's act that is attributable to Sheriff Swearingen. Craft testified at his deposition that he named the sheriff as a defendant because he's at the top of the chain of command, dkt. 47-1 at 204, not because of any act that is properly attributable to the sheriff. Under these circumstances, the *Monell* claim cannot succeed against Sheriff Swearingen, so the Court **grants** summary judgment to Sheriff Swearingen.

NP Otterbein attests that there are no QCC policies, written or unwritten, that would place cost above patient care. Dkt. 51-2 at 8. Craft suggests in his

verified complaint that QCC denies medical care if it is too costly. Dkt. 1 at 6. However, there is nothing to indicate that Craft's testimony about QCC policy is based on personal knowledge. Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that affidavits[5] in support of a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." "'[A]lthough personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" *Weaver v. Speedway*, LLC, 28 F.4th 816, 825 (7th Cir. 2022) (quoting *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (internal quotation omitted*)*; *see also* Fed. R. Evid. 602. On the present record, Craft does not have the requisite personal knowledge to testify about a purported QCC policy to sacrifice patient care for the sake of cost. Therefore, there is no genuine issue of material fact that no such QCC policy exists. The Court **grants** summary judgment in favor of QCC on the *Monell* claim brought against it.

**B. Claims Against Crowley**

Conditions-of-confinement claims for pretrial detainees, which flow from the Due Process Clause of the Fourteenth Amendment, are analyzed under an

[5] "[A] verified complaint is not just a pleading; it is also the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (quoting *Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996)).

objective standard. *Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019). Under this standard, the plaintiff must show "that the conditions in [the jail] posed an objectively serious threat to his health; that the [defendant's] response was objectively unreasonable under the circumstances; and that [the defendant] acted purposely, knowingly, or recklessly with respect to the consequences of [his] actions." *Mays v. Emanuele*, 853 F. App'x 25, 27 (7th Cir. 2021) (citing *Hardeman*, 933 F.3d at 823, 827 and *Miranda*, 900 F.3d at 353–54).

Craft's conditions of confinement claim pertains to the time he spent in medical isolation and in the padded cell, the combined duration of which lasted from August 27 to September 1, 2023. Craft testified at his deposition that he took at least three showers during this time. Dkt. 47-1 at 202. Craft complained about the padded cell being unsanitary and asked for cleaning supplies, which were brought eventually but not immediately. *Id.* at 199. Craft did not tell Crowley that the cell was dirty. *Id.* at 198–200. There is no evidence that Crowley is personally responsible for ensuring cells are clean before inmates are moved into them. Though Crowley was jail commander at the time, there is no supervisory liability under § 1983. *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015). Crowley is entitled to summary judgment on this claim because Craft failed to present evidence that Crowley is liable for the condition of his cells.

Similarly, the Court had allowed a claim to proceed against Crowley for disregarding complaints about the medical care Craft was receiving. Craft admitted at his deposition, though, that he had named Crowley as a defendant for this claim because Crowley is "the head of all of it, so therefore if anybody in

his team do wrongdoing under another and it gets brought up to him, I feel like it, I mean, it falls upon, you know what I mean, the leader." Dkt. 47-1 at 110. As mentioned above, there is no supervisory liability under § 1983. Craft has not presented evidence of Crowley bearing any personal responsibility for any missteps taken in Craft's medical care, so the Court **grants** summary judgment for Crowley on this claim.

### C. Medical Treatment Claims

A pretrial detainee's unconstitutional medical care claim, brought under the Due Process Clause of the Fourteenth Amendment, is analyzed according to the objective unreasonableness inquiry laid out in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *Miranda*, 900 F.3d at 352. A defendant violates a pretrial detainee's due process right to constitutionally acceptable medical care if:

> (1) there was an objectively serious medical need; (2) the defendant committed a volitional act concerning the [plaintiff's] medical need; (3) that act was objectively unreasonable under the circumstances in terms of responding to the [plaintiff's] medical need; and (4) the defendant act[ed] "purposefully, knowingly, or perhaps even recklessly" with respect to the risk of harm.

*Gonzalez v. McHenry County, Ill.*, 40 F.4th 824, 828 (7th Cir. 2022) (quoting *Miranda*, 900 F.3d at 353–54). "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (cleaned up);

*see also Pittman by and through Hamilton v. Madison Cnty., Ill.*, 108 F.4th 561, 570–72 (7th Cir. 2024).

Additionally, to prevail on a Fourteenth Amendment claim against a medical provider, a plaintiff must show that the medical treatment "was such a significant 'departure from accepted professional standards or practices' that it was objectively unreasonable." *Williams v. Patton*, 761 F. App'x 593, 597 (7th Cir. 2019) (unpublished) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). The Court defers to the treatment decisions made by medical staff "unless no minimally competent professional would have so responded under those circumstances" because "there is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted). Mere disagreement with a medical provider's professional judgment does not establish that the provider's medical treatment was objectively unreasonable. *See Williams*, 937 F.3d at 944 (holding that a detainee's disagreement with a course of treatment "does not mean the course of treatment was objectively unreasonable").

As detailed above, Craft attended many medical appointments—both within the Jail's walls and outside of them—during his relatively brief periods of incarceration at the Jail in 2023. His requests for health care resulted in him being seen by medical personnel, and the matter was escalated to outside providers and diagnostic imaging. With this general background in mind, the

Court addresses the specific matters Craft raises in his summary judgment response brief.

First, Craft argues that LPN Leturgez violated his rights when she first examined his eye on July 29, told him it looked like he had metal in his eye, but that it did not look too bad, and directed him to write a healthcare request if it worsened. Craft notes that, when his eye worsened and he followed LPN Leturgez's instructions to seek medical care on August 3, he ultimately ended up in the local emergency department on August 4. There, he was told that the object could not be removed because it had healed over, but it could have been removed if he had been brought in more promptly.

LPN Leturgez did not violate the Fourteenth Amendment. She made a triage decision on July 29 not to elevate the issue to a medical provider and instead made the reasonable recommendation that Craft should submit a medical request if his condition worsened. He was then seen by Nurse Roark two days later on July 31, who did exactly what LPN Leturgez did after also noting the metal shaving in his eye. Dkt. 47-2 at 2. When Craft's eye condition did worsen on August 3, following LPN Leturgez's and Nurse Roark's instructions, Craft sought further medical assistance and promptly received it.

Craft designates only the allegations of his verified complaint to suggest LPN Leturgez actions were unreasonable—that he heard a Union Hospital non-party physician's assistant say that Craft may have missed the opportunity to remove the metal shaving before it healed over. Dkt. 1 at 3. This opinion appears

nowhere in the medical records. And even if this opinion were admissible,[6] it is immaterial. What matters is that LPN Leturgez's actions were objectively reasonable, not necessarily correct with "the 20/20 vision of hindsight." *See Kingsley*, 576 U.S. at 397. And even if unreasonable, LPN Leturgez's actions certainly do not reflect "purposefully, knowingly, or perhaps even recklessly" disregarding the risk of harm. *Gonzalez*, 40 F.4th at 828. Craft designates no evidence that satisfies the "higher" "state-of-mind requirement for constitutional cases." *Miranda*, 900 F.3d at 353–54.

Craft next argues that his rights were violated because, after Dr. Burns at the UAP Eye Clinic told him on August 11 that he would need to see someone else for the foreign body's removal, he had imaging and a repeat visit with the same specialist before seeing a specialist who could perform the removal. Craft's disagreement with the order in which his medical appointments occurred does not render the path of his treatment journey objectively unreasonable. *See Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019) ("[J]ust because the staff declined to provide [the plaintiff] with his desired prescription pain medicine or the comfort of an extra mattress does not mean that the course of treatment was objectively unreasonable."). Further, the medical record shows that the Jail's medical staff had to wait for Eskenazi Eye to call them to set up Craft's appointment. Additionally, the CT scan was recommended by Dr. Burns, not any

[6] Crediting Craft's verified complaint that this opinion was indeed offered by the Union Hospital physician's assistant, the opinion appears to be based on the erroneous assumption that the metal shaving was in Craft's eye "2–3 months," dkt. 47-6 at 1, not approximately one week.

of the defendants. No reasonable jury would conclude from the evidence that any of the defendants acted objectively unreasonably in regard to the scheduling of Craft's outside appointments.

Craft argues, too, that no one checked on him during his week in the medical isolation and padded cells. He cites no evidence in support, and the evidence in the record shows that he was in those cells from August 27 to September 1 and was seen on August 29 and 30. Dkt. 47-1 at 200–02, 207; 47-8 at 2; dkt. 51-1 at 83–84. Craft's argument is unsupported by the evidence and does not suggest objective unreasonableness.

The Court **grants** the motion for summary judgment as to the medical treatment claims.

## V. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment and motion to strike are **GRANTED**. Dkts. [45], [50], [77]. Final judgment will issue in a separate entry.

**SO ORDERED**.

Date: 9/24/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

CHRISTOPHER CRAFT
1116 N. Harrison St.
Brazil, IN 47834

All electronically registered counsel